**In the Matter of L.M.**

No. 03–97–00334–CV.

Court of Appeals of Texas,
Austin.

April 15, 1999.

Rehearing Overruled May 20, 1999.

Keith S. Hampton, Austin, for appellant.

Ronald Earle, Dist. Atty., Karyn D. Scott, Asst. Dist. Atty., Austin, for State.

Before Chief Justice ABOUSSIE, Justices JONES and YEAKEL.

LEE YEAKEL, Justice.

A jury empaneled in the 98th District Court, sitting as the Juvenile Court of Travis County, found that appellant L.M., a child then eleven years of age, engaged in delinquent conduct by committing the offense of injury to a child. *See* Tex. Fam.Code Ann. § 54.03 (West 1996 & Supp.1999); Tex. Penal Code Ann. § 22.04 (West 1994 & Supp.1999). The juvenile court rendered a determinate sentence of twenty-five years' confinement. *See* Tex. Fam.Code Ann. §§ 53.045(a)(7), 54.04(d)(3) (West Supp.1999).[1] Appellant appeals the adjudication of delinquency.

---

**1.** The legislature amended the determinate sentence provision of the Texas Family Code after the offense at issue occurred. *See* Act of May 28, 1997, 75th Leg., R.S., ch. 669, §§ 2, 6, 1997 Tex. Gen. Laws 2265, 2266 (Tex. Fam.Code Ann. § 54.04); Act of June 2, 1997, 75th Leg., R.S., ch. 1086, §§ 8, 11, 53, 1997 Tex. Gen. Laws 4179, 4183–85, 4199 (Tex.

## BACKGROUND

Appellant lived with her grandparents, who are also her adoptive parents, along with several of her siblings. Appellant's grandparents routinely cared for several other unrelated children during the day. The victim in this case, two-year-old Jayla Belton, was one of those children.

On the morning of May 24, 1996, Jayla arrived at the grandparents' house. She appeared tired and feverish when she arrived, and she eventually became sick to her stomach. After Jayla vomited at the lunch table, appellant's eighteen-year-old sister suspected Jayla had a virus. The sister gave Jayla some over-the-counter medication and put Jayla to bed in a bedroom in the back of the house. Appellant's sister then got ready for work, said goodbye to Jayla, and told her grandfather to check on Jayla later because she was sick. When the sister left the house about 2:40 p.m., her grandfather was seated in the living room.

No one checked on Jayla or heard anything from her until late that afternoon. According to the grandfather, who remained in the living area of the house,[2] appellant came in from outside and went to the back of the house, near the bedroom where Jayla was sleeping. Shortly after that, he heard "thumping" noises in another room in the same area of the house. He assumed appellant was playing ball in her bedroom and eventually told her to stop. Soon afterward, appellant appeared in the living area and told her grandfather that something was wrong with Jayla, and that she had been throwing up and shaking. At his urging, appellant brought Jayla from the back bedroom to the living area. According to appellant's grandfather, Jayla appeared to be ill. He wiped Jayla's face with a wet cloth and told

appellant to take Jayla outside to warm her.

About the same time or shortly thereafter, the mother of some other children cared for in the home arrived. She observed Jayla's condition and told appellant's grandfather to call 911. He refused, and suggested that she take Jayla to the hospital. When she refused, the grandfather and appellant took Jayla to the hospital. Jayla had no pulse or respiration when she arrived at the hospital; hospital personnel unsuccessfully attempted to revive her. After Jayla was pronounced dead, appellant was taken to the Child Advocacy Center, where she told personnel that she did not know what happened to Jayla.

During the autopsy, a medical examiner determined that Jayla died of a severe injury to her liver caused by a "massive blunt" blow to the abdomen. According to the examiner, the traumatic blow was so forceful that it broke four of her ribs and split her liver in two pieces, possibly by forcing the liver to compress against her spine. He concluded that Jayla died within five to fifteen minutes after receiving the blow to the liver. The examiner also observed some thirty bruises on Jayla's body, including bruises on the back of her head, over her ear, on her forehead, on her back, on her shoulder, below her abdomen, on her elbow, on her chest, and on the left side of her torso. The bruises on the left side of her torso formed two parallel lines, one longer than the other. The medical examiner concluded that Jayla's injuries had been intentionally inflicted and ruled Jayla's death a homicide.

The following day, law-enforcement authorities removed all the children from the grandparents' home. They placed appellant and one of her sisters in a private children's shelter that contracted with the

---

Fam.Code Ann. §§ 53.045, 54.04). The prior version of the law applies to this case. *See id.* The amendments do not, however, apply to this case. We cite to the current code for convenience.

2. Appellant's grandfather, who suffered from polio as a child, is paralyzed from the waist down, uses crutches to walk, and therefore is unable to move freely about the house.

Department of Protective and Regulatory Services (the "Department"). At the time the children were removed, they were thought to be in danger. After speaking with other members of the household, however, the focus of the homicide investigation shifted to appellant, or at least appellant and her sister. As a result, law enforcement authorities arranged to question both appellant and her sister at the shelter. On May 29, 1996, five days after Jayla's death and three days after appellant was removed from her grandparents' home, two police officers and a representative of the Victim Services Division of the Austin Police Department met with appellant in a room at the administrative offices of the children's shelter. Over a period of about two hours, appellant answered the officers' questions concerning the events surrounding Jayla's death. The interview was recorded. Near the end of the interview, appellant signed a written statement prepared by the officers implicating herself in Jayla's death.

The next day, appellant was taken into custody by law-enforcement authorities. The State petitioned for a determinate sentence, charging appellant with capital murder and injury to a child.[3] *See* Tex. Penal Code Ann. §§ 19.02(b)(1), .03(a)(8), 22.04(a)(1) (West 1994). The case was tried to a jury charged with deciding whether appellant committed capital murder or one of two lesser-included offenses, manslaughter or criminally negligent homicide. The jury was also charged with deciding whether appellant had committed injury to a child. The jury acquitted appellant of capital murder

and manslaughter, but found her guilty of criminally negligent homicide and injury to a child. Appellant moved for a new trial. The juvenile court ordered a new trial, but on his own motion.

At the second trial, the State only charged appellant with injury to a child. The State's theory at trial was this: appellant had a propensity to act violently toward children; she bore the unenviable responsibility of cleaning the house on the day of the incident; Jayla vomited in the morning and appellant had to clean it up; when appellant checked on Jayla in the afternoon, appellant found that Jayla had thrown up again; appellant attacked Jayla out of anger by viciously kicking or stomping her, intentionally causing the fatal injuries but not intending Jayla's death; and appellant's family feigned ignorance of these events to protect appellant at trial. The State presented evidence that the parallel bruises on Jayla's left side matched parallel treads on the bottom of the shoes appellant was wearing on the day of the incident. Appellant, on the other hand, theorized as follows: Jayla was a chronically battered child with numerous old scars and bruises on her body; Jayla's mother's boyfriend had a propensity to act violently toward Jayla; he had inflicted an injury to Jayla that caused her liver to be partially damaged before she ever arrived at the grandparents' house; Jayla was sick all day because of *that* injury; appellant simply discovered an already dying Jayla in the back bedroom in the late afternoon; and hospital personnel caused Jayla's ribs to crack and her liver to become more

3. We recognize that proceedings regarding juveniles are governed by the Family Code, are civil in nature, and seek, where appropriate, to remove "the taint of criminality from children committing certain unlawful acts." Tex. Fam.Code Ann. § 51.01(2)(B) (West 1996). However, the standards to be applied in juvenile adjudications are generally those employed in criminal proceedings. *See In re Gault*, 387 U.S. 1, 49, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (juvenile proceedings regarded as criminal for purposes of application of certain constitutional rights); Tex. Fam. Code Ann. § 54.03(f) (West 1996) (burden on State to prove beyond reasonable doubt that child has engaged in delinquent conduct). In the briefs of both appellant and the State, as well as in testimony before the juvenile court, terms more suitable to adult criminal proceedings are often used. Where we deem appropriate for convenience and understanding, we will utilize the same terms as the parties.

severely injured when they attempted to resuscitate her.

The jury in the second trial found appellant guilty of injury to a child. The juvenile court rendered judgment adjudicating appellant delinquent, and ordering her to the custody of the Texas Youth Commission for a period of twenty-five years.[4] Appellant appeals the adjudication of delinquency and disposition in fourteen issues.

## DISCUSSION

### Double Jeopardy

In her first issue, appellant contends that the double-jeopardy provisions in the Texas and United States constitutions barred the adjudication of guilt of injury to a child in the second trial. See U.S. Const. amends. V, XIV; Tex. Const. art. I, § 14. Appellant's argument attempts to explain why the State's second prosecution constituted a violation of her double-jeopardy protection. First, she contends all three of the homicide theories included in the jury charge at the first trial were the same as the offense of injury to a child.[5] By arguing that homicide of a child is the same offense as injury to a child, appellant seeks to establish that the acquittal of capital murder and manslaughter necessarily constituted an acquittal of injury to a child. She also contends that the finding of guilt on the criminally negligent homicide charge precluded the State from instituting a second prosecution for injury to a child.[6]

Appellant does not separately argue her state and federal constitutional claims, nor does she proffer argument or authority to support a holding that, in the context of this cause, the Texas Constitution's double-jeopardy clause differs meaningfully from the Fifth Amendment to the United States Constitution. She simply urges us to interpret the Texas Constitution more broadly without explaining the basis for her urging. The rules of appellate procedure require more. See Tex.R.App. P. 38.1(h) (appellant's brief must contain clear and concise argument with appropriate citations to authorities). We therefore overrule issue one insofar as it pertains to the Texas Constitution. See Queen v. State, 940 S.W.2d 781, 783 (Tex.App.—Austin 1997, pet. ref'd) (citing Ex parte Granger, 850 S.W.2d 513, 515 n. 6 (Tex.Crim.App. 1993)). We will conduct our analysis only under the federal constitution.

The Fifth Amendment double-jeopardy provision embodies three types of protection against: (1) a second prosecution for the same offense following conviction; (2)

---

4. In accordance with the determinate-sentencing statutes, upon appellant's reaching the age of sixteen and until she is twenty-one years of age, appellant is subject to transfer to the institutional division of the Texas Department of Criminal Justice to serve the rest of her sentence. See Tex. Hum. Res.Code Ann. § 61.079 (West Supp.1999); Tex. Fam.Code Ann. §§ 54.04(d)(3), 54.11 (West 1996 & Supp.1999).

5. Appellant contends in her brief that the homicide offenses are lesser than and included in the offense of injury to a child. However, at oral argument, she contended they were the same offenses for purposes of double jeopardy. Her oral argument is broader, in that it alleges either the homicide offenses were lesser than and included in the offense of injury to a child, or vice versa. In an attempt to fully clarify the issue, we will address the broader version of appellant's argument.

6. Appellant's first issue includes five subpoints, which appear to either duplicate or relate to each other in some but not all aspects. The argument under several of the subpoints is not altogether clear. We have attempted here to fairly summarize appellant's principal arguments. It appears that, in addition to the arguments detailed above, appellant complains that she was twice put in jeopardy in the first trial alone, without regard to the State's subsequent prosecution. Specifically, appellant seems to argue that the juvenile court's charge in the first trial allowed the jury to adjudicate her guilty of two offenses when those offenses were in fact the "same" for double-jeopardy purposes. The correctness of the juvenile court's charge in the first trial is not at issue here because the court granted appellant a new trial. We therefore do not consider this argument.

a second prosecution for the same offense following acquittal; and (3) multiple punishments for the same offense. *E.g., Department of Revenue of Montana v. Kurth Ranch,* 511 U.S. 767, 769 n. 1, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994) (citing *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)); *Ex parte Rhodes,* 974 S.W.2d 735, 738 (Tex.Crim. App.1998). Because the juvenile court has not imposed multiple punishments, the third type of protection is not implicated in this case. The first two types are, however, at issue. We must decide whether the acquittal of capital murder and manslaughter in the first trial barred the subsequent prosecution for injury to a child. We must also decide whether the adjudication of guilt of criminally negligent homicide in the first trial barred subsequent prosecution for injury to a child. To answer both these questions, we must decide whether each of the homicide theories charged in the first trial were the "same" as the injury to a child offense charged in the second trial.

■■■ To determine whether two offenses are the same for double-jeopardy purposes, we apply the "same-elements" test set forth in *Blockburger v. United States.*[7] *See United States v. Dixon,* 509 U.S. 688, 698, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) (reaffirming validity of *Blockburger*); *Parrish v. State,* 869 S.W.2d 352, 353 (Tex.Crim.App.1994). That is, we determine whether each offense contains an element not contained in the other. *See Dixon,* 509 U.S. at 698, 113 S.Ct. 2849. The essential elements of the offenses in a double-jeopardy analysis are not only those in the penal statutes, but also those set forth in the charging instrument. *See Parrish,* 869 S.W.2d at 354 (construing *Dixon,* 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556); *Queen,* 940 S.W.2d at 784. Appellant urges us to conduct our analysis by considering the scope of conduct at issue, or the proof actually adduced, at the first and second trials. This method of

analysis has now been rejected. *See Dixon,* 509 U.S. at 704, 113 S.Ct. 2849 (overruling *Grady v. Corbin,* 495 U.S. 508, 510, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990)); *see also Rhodes,* 974 S.W.2d at 739; *Parrish,* 869 S.W.2d at 353–54. Accordingly, we do not consider, as appellant urges, the scope of the conduct or actual proof to be adduced at trial in attempting to distinguish the offenses; we look only to the allegations in the charging instrument.

The charging instrument at the second trial alleged appellant committed injury to a child by: (1) intentionally and knowingly causing serious bodily injury, namely bodily injury that created a substantial risk of death and protracted loss and impairment of function of a bodily organ, (2) to Jayla Belton, a child younger than fourteen years of age, (3) by kicking, stomping, and striking her, (4) with a deadly weapon. *See* Tex. Penal Code Ann. § 22.04. We must determine whether this offense was the same as each of the homicide theories submitted at the first trial.

The charging instrument at the first trial alleged appellant committed capital murder by: (1) intentionally and knowingly causing the death, (2) of Jayla Belton, a person under six years of age, (3) by kicking, stomping, and striking her, (4) with a deadly weapon. *See* Tex. Penal Code Ann. §§ 19.02(b), .03(a)(8) (West 1994). The other homicide theories submitted to the jury differed only in that they alleged lesser culpable mental states, namely "recklessness" with respect to the offense of manslaughter and "criminal negligence" with respect to the offense of criminally negligent homicide. *See id.* §§ 19.04, .05. We will analyze each of the submitted theories of homicide separately.

■■ The charged offense of criminally negligent homicide is not the same as the charged offense of injury to a child because each offense includes an element not included in the other. Specifically, injury to a child requires a greater culpable men-

**7.** 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306     (1932).

tal state (intent and knowledge) than criminally negligent homicide (criminal negligence). On the other hand, criminally negligent homicide requires proof of death, which is not required for injury to a child. Injury to a child requires only proof of serious bodily injury, and the State can satisfy that element with proof of an injury less serious than death. Because the two offenses are not the same, the jury's finding of guilt of criminally negligent homicide at the first trial does not constitute a double-jeopardy bar to the second prosecution for injury to a child.

Similarly, the jury's acquittal on the manslaughter charge has no bearing on the second prosecution for injury to a child. Manslaughter is not the same as injury to a child for the same reasons that criminally negligent homicide is not the same as injury to a child.

■■■ Application of the *Blockburger* principles to the charge of capital murder leads us to a slightly different result. Capital murder does include an element not required to prove injury to a child, namely the death of the victim. Therefore, capital murder is not subsumed within the offense of injury to a child. *Cf. Wright v. State*, 866 S.W.2d 747, 750 (Tex. App.—Eastland 1993, pet. ref'd) (citing *United States v. Webb*, 796 F.2d 60 (5th Cir.1986), *cert. denied*, 479 U.S. 1038, 107 S.Ct. 894, 93 L.Ed.2d 846 (1987)) (holding non-capital murder and injury to a child not same offenses for double-jeopardy purposes, noting murder requires proof of death while injury to a child does not). The opposite is true also: injury to a child does not require proof of any element not already included in capital murder as alleged in the charging instrument. The culpable mental states for the offenses are the same. Only the seriousness of the injury differs, and capital murder requires the more serious injury. Consequently, appellant's broad argument that the offenses are the same is partially true: injury to a child is subsumed within the offense of capital murder as charged in the first trial, and lesser-included offenses are the "same" for purposes of double jeopardy. *Cf. Florio v. State*, 814 S.W.2d 778, 783 (Tex.App.—Houston [14th Dist.] 1991), *aff'd*, 845 S.W.2d 849 (Tex.Crim.App.1992) (under *Blockburger* analysis, injury to a child *not* lesser-included offense of non-capital murder *only because* non-capital murder does not require proof of victim's age).[8]

■■■ Although appellant's argument is partially correct, we do not reach the result for which she contends. The jury's acquittal of appellant for the greater-inclusive offense of capital murder in the first trial does not in any way affect the propriety of the second prosecution for the lesser-included offense. The first jury failed to find that appellant intentionally and knowingly caused Jayla's death, but they did find that she intentionally and knowingly caused Jayla serious bodily injury. The juvenile court, on its own motion, then granted a new trial for reasons other than insufficiency of the evidence. The second prosecution concerned only the allegations found to be true by the first jury. When a jury acquits a person of one offense *but* finds the person guilty of a lesser-included offense, *and* the verdict is overturned or a new trial granted for a reason other than insufficiency of the evidence, double-jeopardy principles do not bar a second prosecution for the lesser-included offense. *Green v. United States*, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957), *cited in Stine v. State*, 935 S.W.2d 443, 445 (Tex. App.—Waco 1996, pet. ref'd) (first verdict overturned on appeal for jurisdictional er-

---

8. Injury to a child is a lesser-included offense of capital murder of a child even under the Texas statute defining lesser-included offenses. *See* Tex.Code Crim. Proc. Ann. § 37.09(1), (2) (West 1981) (former established by proof of same or less than facts required to prove latter; former differs from latter only in that less serious injury or risk of injury suffices as proof); *see also Parrish v. State*, 869 S.W.2d 352, 354 (Tex.Crim.App. 1994) (referring to section 37.09 in context of double-jeopardy analysis).

ror); *Konchar v. State,* 938 S.W.2d 500, 502 (Tex.App.—Tyler 1996, no pet.) (new trial granted based on procedural error); *see also Ex parte Queen,* 877 S.W.2d 752, 754–55 (Tex.Crim.App.1994) (citing *Lofton v. State,* 777 S.W.2d 96 (Tex.Crim.App. 1989) (holding double jeopardy does not bar second trial after granting of new trial for reason other than insufficiency of evidence)). Because the homicide offenses were either different from or at most greater than and inclusive of the offense tried in the second prosecution, and because the first jury found appellant guilty of the lesser-included offense, the first trial for the homicide offenses did not bar the second prosecution for the lesser-included offense. Accordingly, we overrule the remainder of appellant's first issue.

## Legal Sufficiency

■ In issue four, appellant contends that "the evidence in this case was legally insufficient to support the verdict because the evidence is at least as consistent with innocence as with guilt." [9] Adjudications of delinquency in juvenile cases are based on the criminal standard of proof. *See* Tex. Fam.Code Ann. § 54.03(f) (West 1996). Therefore, we review adjudications of delinquency in juvenile cases by applying the standards applicable to challenges to the sufficiency of the evidence in criminal cases. *See In re E.P.,* 963 S.W.2d 191, 193 (Tex.App.—Austin 1998, no pet.). In reviewing a legal-sufficiency challenge, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense

beyond a reasonable doubt. *See id.* (citing *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). We do not disregard evidence merely because it is as consistent with innocence as with guilt. *See Geesa v. State,* 820 S.W.2d 154, 161 (Tex.Crim.App.1991). The State need not disprove alternative hypotheses when attempting to prove a person committed an offense. *See id.* And we must consider all the evidence presented, whether properly or improperly admitted. *See Nickerson v. State,* 810 S.W.2d 398, 400 (Tex.Crim.App. 1991) (en banc); *Deason v. State,* 786 S.W.2d 711, 716 (Tex.Crim.App.1990).

■ We have previously set forth the evidence the jury considered in reaching its verdict. Viewing this evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could find the essential elements of the offense of injury to a child beyond a reasonable doubt. We therefore hold that the evidence is legally sufficient to support the jury's finding that appellant intentionally and knowingly inflicted injury upon Jayla that produced a substantial risk of death. Accordingly, we overrule the contention raised by appellant's fourth issue.

## Custodial Interrogation

■ In issues six through nine, appellant challenges the admissibility of both her recorded and written statements made during questioning by police at the children's shelter.[10] Appellant contends in issue six that the trial court erred by admitting in evidence her statements obtained

9. In issue three, appellant also asserts a legal-sufficiency argument due to a "fatal variance" between the State's charging instrument and the State's proof at trial. The typical situation giving rise to a claim of fatal variance arises when the State proves something *different* from what is alleged in the charging instrument. *See Weaver v. State,* 551 S.W.2d 419, 421 (Tex.Crim.App.1977) (State alleged use of "Ruger" pistol, but proved use of "Luger" pistol; court held fatal variance existed). In this case, the State simply proved more than the minimum facts necessary to satisfy

the allegations in the charging instrument. Proof of additional facts does not render the State's proof at odds with the allegations in the charging instrument.

10. Appellant's arguments are not altogether clear whether she calls into question the admissibility of the recorded statement, the written statement, or both. To ensure that all of appellant's contentions are properly addressed, we will assume that she challenges both statements in each of these issues.

by law-enforcement officers when appellant was questioned at the children's shelter because they were a product of a custodial interrogation conducted in violation of section 51.095 of the Texas Family Code. *See* Tex. Fam.Code Ann. § 51.095 (West Supp.1999).[11] Specifically, appellant argues that she was "in custody" when she was questioned by the officers, thereby invoking the requirement that a magistrate administer pre-statement warnings provided under section 51.095(a) (formerly section 51.09(b)), and that the violation of this requirement rendered both statements inadmissible under article 38.23 of the Texas Code of Criminal Procedure.[12] The State rejoins that appellant cured any possible error in this regard because appellant herself asked the juvenile court to admit a written transcript of the purportedly illegally obtained statements in evidence before the jury after the court admitted her recorded statements.

**Waiver**

■ Appellant objected to the admission of both statements in a pretrial motion to suppress, which the juvenile court denied. When a court overrules a pretrial motion to suppress evidence, the accused need not subsequently object to the admission of the same evidence at trial to pre-serve error. *E.g., Harris v. State,* 656 S.W.2d 481, 485 (Tex.Crim.App.1983). Based on this rule, appellant's pretrial motion would ordinarily have been sufficient to preserve her objection to the admissibility of the evidence.

■ But when the defendant offers the same evidence to which she earlier objected, she is not in a position to complain on appeal. *See Womble v. State,* 618 S.W.2d 59 (Tex.Crim.App.1981); *Cameron v. State,* 530 S.W.2d 841 (Tex.Crim.App. 1975); *Palmer v. State,* 475 S.W.2d 797 (Tex.Crim.App.1972). When a court has overruled an objection to the admission of evidence, the ruling will not be reversible error when the same evidence is subsequently admitted by the defendant. *See Leday v. State,* 983 S.W.2d 713, 717 (Tex. Crim.App.1998) (citing *Massey v. State,* 933 S.W.2d 141, 149 (Tex.Crim.App.1996)). *See also Bush v. State,* 697 S.W.2d 397, 404 (Tex.Crim.App.1985) (when court erroneously admits evidence, but objecting party introduces same evidence through some other means, error is rendered harmless).[13]

■ There exists, however, a corollary to this rule, that "the harmful effect of improperly admitted evidence is not cured by the fact that the defendant sought to

---

11. In 1997, the Texas Legislature amended section 51.09 of the Family Code by moving the substance of subsections (b), (c), and (d) to section 51.095. *See* Act of May 14, 1997, 75th Leg., R.S., ch. 1086, § 4, 1997 Tex. Gen. Laws 4179, 4181–83; Tex. Fam.Code Ann. § 51.095 (West Supp.1999). The 1997 amendments, however, did not change the provisions of former section 51.09 at issue in this case. Therefore, we will refer to the current section for purposes of this opinion.

12. Article 38.23 provides in pertinent part:
   No evidence obtained by an officer or other person in violation of any provision of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.
   Tex.Code Crim. Proc. Ann. art. 38.23 (West Supp.1999). "[J]uvenile proceedings to de-termine 'delinquency' which may lead to commitment to a state institution, must be regarded as 'criminal' for purposes of the privilege against self-incrimination." *In re Gault,* 387 U.S. at 49, 87 S.Ct. 1428.

13. In *Bush v. State,* 697 S.W.2d 397, 403 (Tex.Crim.App.1985), the Texas Court of Criminal Appeals mistakenly used the term "curative admissibility" to describe the doctrine of harmless error. *See Leday v. State,* 983 S.W.2d 713, 716 (Tex.Crim.App.1998). "[T]he doctrine of curative admissibility allows one party to introduce evidence that might otherwise be excluded, to counter the unfair prejudicial use of the same evidence by the opposing party." *Id.* (citing Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure* § 5039 n.4 (1977)). The doctrine of curative admissibility, therefore, does not apply in this case.

meet, destroy, or explain it by the introduction of rebutting evidence." *Maynard v. State*, 685 S.W.2d 60, 65 (Tex.Crim.App. 1985). Appellant contends she did not waive her objection or render any error harmless by offering the transcript of her statements for admission into evidence because she *used* the transcript to rebut the voluntariness and reliability of her own statements previously offered by the State and admitted into evidence by the juvenile court. "Independent admission of evidence of the same facts without objection, it will be observed, is a concept wholly distinct from use, in that it is independent of the erroneous admission of evidence, whereas the use is dependent upon the prior evidence, inasmuch as it is an attempt to rebut it." *Nicholas v. State*, 502 S.W.2d 169, 175 (Tex.Crim.App.1973).

■ Our review of the record in this case makes plain that appellant was not offering the subject transcript as evidence of substantially the same facts as those previously objected to, but rather, was making use of the transcript, in conjunction with testimony on cross-examination, as a predicate for rebutting their incriminating effect. Therefore, we conclude that appellant's proffer and use of the transcript sought to meet and destroy the force of the statements offered into evidence by the State. *See id.*

### Privilege Against Self–Incrimination

Having concluded that appellant did not waive her objection to the admission of her statements, we must next determine whether appellant's statements were obtained as a result of a custodial interrogation. In denying appellant's motion to suppress, the juvenile court ruled that appellant was not "in custody" when she was questioned by two law-enforcement officers at the children's shelter. In his findings of fact and conclusions of law, the juvenile court specifically found that section 51.095 of the Family Code requires that certain warnings be given to a juvenile by a magistrate before the juvenile's

statement is admissible if the juvenile "is in a detention facility or other place of confinement or in the custody of an officer." The court concluded that the children's shelter was not a jail, detention facility, or place of confinement. The court further concluded that appellant was not placed under arrest or in the custody of an officer during her interview at the children's shelter, or immediately thereafter. We must grant almost total deference to a trial court's determination of the historical facts that the record supports, especially when the court's fact findings are based on an evaluation of credibility and demeanor. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997) (citing *Villarreal v. State*, 935 S.W.2d 134, 139–41 (Tex.Crim.App.1996) (McCormick, P.J., concurring)). The same amount of deference must be afforded to the trial court's rulings on "application of law to fact questions," also known as "mixed questions of law and fact," if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *See id.* However, we may review de novo "mixed questions of law and fact" not falling within this category. *See id.* Because there is no disagreement about the facts or credibility of the witnesses in this case, we will review de novo the juvenile court's legal determination that appellant was not in custody at the time she was questioned at the children's shelter.

Section 51.095(b) of the Family Code provides that the requirements of section 51.095(a) do not preclude the admission of a statement made by a child if "the statement does not stem from custodial interrogation." Tex. Fam.Code Ann. § 51.095(b)(1) (formerly section 51.09(d)(2)). In the context of an accused adult, the Texas Court of Criminal Appeals defines "custodial interrogation" as the questioning by law-enforcement officers after a person has been taken into custody or otherwise has been deprived of his freedom in a significant way. *See Cannon v. State*, 691 S.W.2d 664, 671 (Tex.Crim.App.

1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931, (1986) (citing *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

■ The United States Supreme Court has extended many constitutional procedural rights ordinarily associated with criminal trials to juvenile-delinquency proceedings. *See In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *Vasquez v. State,* 816 S.W.2d 750, 752 (Tex. Crim.App.1991). *Gault* specifically concluded that the constitutional privilege against self-incrimination applicable to an adult applies equally in the case of a juvenile. *Gault,* 387 U.S. at 55, 87 S.Ct. 1428. Then in 1973, the Texas Legislature enacted Title III of the Family Code ("Title III") to assure juveniles a fair hearing in which their constitutional and statutory rights are recognized and enforced. *See Lovell v. State,* 525 S.W.2d 511, 513 (Tex. Crim.App.1975); Tex. Fam.Code Ann. § 51.01 (West 1996). Aware of *Gault,* as well as the admonition in *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), that admissions and confessions made by a juvenile require careful inquiry and special caution, the legislature enacted Title III to determine and protect the best interest of the juvenile, assure that the juvenile's constitutional and statutory rights are recognized and enforced, and permit waiver of the juvenile's rights only under certain carefully prescribed conditions. *See In re R.E.J.,* 511 S.W.2d 347 (Tex.Civ.App.—Houston [1st Dist.] 1974, no writ). The Family Code underscores its protections by providing that a juvenile's extrajudicial statement, obtained without fulfilling the requirements of Title III or the United States or Texas Constitutions, may not be used against her. *See* Tex. Fam.Code Ann. § 54.03(e) (West 1996). Since its passage, Texas courts have upheld the legislature's safeguards for juveniles, including the protection against self-incrimination, unless the juvenile waives that right in accordance with the terms of the statute. *See Petree v.*

*State,* 778 S.W.2d 507, 515 (Tex.App.— Dallas 1989, no writ). Indeed, we may do no less:

> If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.

*Gault,* 387 U.S. at 55, 87 S.Ct. 1428.

■ In determining whether an individual was in custody, courts examine all the circumstances surrounding the interrogation to answer the ultimate inquiry: whether there was a formal arrest or restraint of movement to the degree associated with a formal arrest. *See California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)); *Meek v. State,* 790 S.W.2d 618, 621 (Tex.Crim.App. 1990); *La Point v. State,* 650 S.W.2d 821, 824 (Tex.Crim.App.1983). In Texas, the standard used to answer this inquiry in cases involving adults is clear: "a person is 'in custody' only if, under the circumstances, a *reasonable person* would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Dowthitt v. State,* 931 S.W.2d 244, 254 (Tex.Crim.App.1996) (emphasis added) (citing *Stansbury v. California,* 511 U.S. 318, 322–24, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)). The standard to be applied to juveniles, however, is not so well defined.

The State relies on this Court's decision in *Rodriguez v. State,* 939 S.W.2d 211 (Tex. App.—Austin 1997, no pet.) as the standard to apply in this case. Applying the reasonable-person standard, we held in *Rodriguez* that a person who accepts an invitation by law-enforcement officers to travel to the police station for questioning is not "in custody" and therefore is not subject to the requirements of *Miranda.*

*See id.* at 217. The defendant in that case, however, was an adult, not an eleven-year-old child.

Two recent cases from the Fourth Court of Appeals have addressed the proper application of the reasonable-person standard to juveniles in cases involving an alleged custodial interrogation. *In re S.A.R.*, 931 S.W.2d 585 (Tex.App.—San Antonio 1996, writ denied), involved a juvenile who was taken by four law-enforcement officers in a marked car to the police station where she was photographed, fingerprinted, informed she was a suspect, and placed in a room with three officers for questioning. Citing *Miranda*, the court held that "a reasonable person would believe their [sic] freedom of movement had been significantly curtailed." *Id.* at 587. The court further held that "whether viewed subjectively or objectively, we conclude that S.A.R. was in custody at the time she gave her statement." *Id.*

In a subsequent case, *In re V.M.D.*, 974 S.W.2d 332 (Tex.App.—San Antonio 1998), a twelve-year-old gave several statements to law-enforcement officers at the police station regarding her behavior with the victims on the day of their deaths. The court of appeals held that the juvenile's statements were not the product of a custodial interrogation because: (1) she voluntarily came with her mother to the police station; (2) she was never handcuffed or otherwise restrained; and (3) she left the station with her mother after each statement was taken. *Id.* at 346. The court again based its decision on the standard of a reasonable person under the objective circumstances of the case. *Id.* at 345. While both cases clearly utilized the reasonable-person standard established in *Stansbury*, the court's reasoning in reviewing the attendant circumstances of each case impliedly considered the age of the defendant.

Other states have successfully developed an "in custody" standard directly tailored to interrogations involving juveniles. Some states consider "whether a reasonable person in child's position—that is, a child of similar age, knowledge and experience, placed in a similar environment—would have felt required to stay and answer all of [the officer's] questions." *State ex. rel. Juvenile Dep't of Multnomah County v. Loredo*, 125 Or.App. 390, 865 P.2d 1312, 1315 (1993); *see also State v. D.R.*, 84 Wash.App. 832, 930 P.2d 350, 353 (1997); *State ex. rel. Juvenile Dep't of Lane County v. Killitz*, 59 Or.App. 720, 651 P.2d 1382, 1383–84 (1982). In *State v. D.R.*, a fourteen-year-old was questioned in the principal's office of his school by the assistant principal, a social worker, and a plain-clothed officer regarding an alleged act of incest between the fourteen-year-old and his thirteen-year-old sister. 930 P.2d at 351. Relying on the Oregon court of appeals' decisions in *Killitz* and *Loredo*, the Washington court of appeals applied the following standard: "whether a 14-year-old in [the defendant's] position would have 'reasonably supposed his freedom of action was curtailed.'" *Id.* at 353. The court held that the juvenile was in custody when he was questioned based on the following factors: (1) most importantly, he was not informed he was free to leave; (2) his young age; (3) the naturally coercive nature of school and principal's office environment for a child of his age; and (4) the obviously accusational nature of the interrogation. *Id.* at 353–54.

Decisions of other states have also developed a "reasonable juvenile" standard, focusing on the impact of the objective circumstances surrounding the interrogation of a juvenile of specific age. *See People v. T.C.*, 898 P.2d 20 (Colo.1995) (en banc); *Commonwealth v. A Juvenile*, 402 Mass. 275, 521 N.E.2d 1368 (1988); *In re Chad L.*, 131 A.D.2d 760, 517 N.Y.S.2d 58, 59 (1987) (applying standard of whether reasonable ten-year-old, innocent of any crime, would have believed his freedom had been infringed upon in significant way). *People v. T.C.* involved an eleven-year-old who voluntarily went to the police with his mother to report his eyewitness

account of a murder. Outside the presence of his mother and without the benefit of a *Miranda* warning, law-enforcement officers repeatedly questioned the eleven-year-old about his involvement in the crime. Eventually, the eleven-year-old confessed to participating in the crime. The juvenile court concluded that the eleven-year-old was in custody at the time he was interrogated, and the Colorado Supreme Court affirmed the juvenile court's conclusion on that issue. *People v. T.C.,* 898 P.2d at 28. Applying the reasonable-person standard used in custodial interrogations involving adults, the Colorado Supreme Court concluded that the juvenile court properly included consideration of the juvenile's age as a factor in determining whether the juvenile was in custody during his interrogation. *Id.* at 25–26. "[T]he circumstances of the interrogation, including the length of the interrogation and the fact that it involved an eleven-year-old, would lead a reasonable person in T.C.'s situation to feel that 'he had no choice but to stay and listen to the officer.'" *Id.* at 25.[14]

In *Commonwealth v. A Juvenile,* the juvenile confessed to aggravated robbery to the assistant director of a home for troubled adolescents in which he was living; the assistant director then took the juvenile to the police station where he confessed a second time. 521 N.E.2d at 1369. Applying the standard of a "reasonable person in the juvenile's position," the Massachusetts Supreme Court concluded that, based on the following factors, the juvenile was in custody when he was questioned by the assistant director: (1) the interrogation was not at home but at a "detention facility" in which the juvenile was placed by the Department of Youth where he was supervised and not free to leave; (2) the investigation focused on the juvenile; (3) the juvenile was physically restrained immediately before he made his confession; and (4) the assistant director was acting on behalf of the police, not as a private citizen. *Id.* at 1370.

We believe it appropriate for Texas courts to consider the age of the juvenile in determining whether the juvenile was in custody. Thus, we adopt a standard similar to that utilized in the cases discussed above; that is, whether, based upon the objective circumstances, a reasonable child of the same age would believe her freedom of movement was significantly restricted. Our holding does not conflict with the standard applied in earlier Texas cases, but expressly provides for consideration of age under the reasonable-person standard established in *Stansbury.* See generally *In re S.A.R.,* 931 S.W.2d at 587; see also *E.A.W. v. State,* 547 S.W.2d 63, 64 (Tex.Civ.App.—Waco 1977, no writ) (Juvenile's right to due process violated even when provisions of Family Code satisfied because "a child of such immaturity and tender age [eleven] cannot knowingly, intelligently, and voluntarily waive her constitutional privilege against self-incrimination in the absence of the presence and guidance of a parent or other friendly adult, or of an attorney.").

Appellant was involuntarily removed from her home by the Department and placed in a children's shelter pursuant to the emergency provisions of section 262 of the Family Code. See Tex. Fam.Code Ann. § 262.104 (West Supp.1999).[15] She had never been arrested or detained, and she had no experience with the legal system or law enforcement. While we agree with the juvenile court's finding that the shelter was not a jail or detention facility, the record before this Court does not support the juvenile court's finding that, under these circumstances, the shelter was not a place of confinement. Pursuant to the show-cause order, the Department was

**14.** *See also People in Interest of R.A.,* 937 P.2d 731, 737 (Colo.1997) (en banc).

**15.** The 1997 amendments to section 262.104 of the Family Code do not apply in this case. Therefore, we refer to the current statute for the purpose of convenience only.

made managing conservator of appellant and several of her siblings, and was granted the following rights, privileges, duties, and powers:

1. the duty of care, control, protection, and reasonable discipline of the subject Children;

2. the duty to provide the subject Children with clothing, food, and shelter; and

3. the power to consent to medical and surgical treatment for the health and safety of the subject Children.

The Department then placed appellant in the children's shelter, a provider agency under contract with the Department. Testimonial evidence presented at the hearing on the motion to suppress indicates that by its contract the shelter assumed the powers and duties granted to the Department over appellant by the show-cause order. Testimonial evidence also indicates that while the doors were not locked, appellant would have to "run away" in order to leave the shelter. Had appellant announced that she was leaving, employees of the shelter most probably would have tried to restrain her. While appellant was not "incarcerated" in the children's facility, she was within the custody of the shelter and under its control, having been placed there by court order. She was not free to leave. Even if appellant were technically "free"

to leave, the evidence reflects that while her grandparents' home was in Austin, the children's shelter was in Round Rock, some miles apart. As an eleven-year-old, appellant totally lacked the means to voluntarily leave the shelter and return to her family. Finally, she was not returned to her grandparents' home even after law-enforcement authorities determined that there was no danger to her there. Therefore, we conclude that the evidence in the record clearly shows that at the time she was questioned appellant was deprived of her freedom in a significant way.

■ Moreover, appellant's protective shelter became a place of isolation. When law-enforcement officers called the children's shelter and requested that appellant be made available for further questioning, the shelter neither notified appellant's grandparents of the scheduled interview nor provided appellant with a guardian, a parental representative, or even an employee of the shelter for the interview.[16] At the time of her interview, the police had shifted the focus of the homicide investigation from the adults in the grandparents' home and toward appellant; yet she was not taken before a magistrate before she was questioned. At the beginning of the interview, appellant was informed of her right to remain silent, her right to an attorney, and her right to terminate the interview at any time.[17] She was not, how-

16. Indeed, Texas courts require that a juvenile receive guidance from or the presence of a parent or other adult *in loco parentis* before waiving her constitutional privilege against self-incrimination under section 51.09 of the Family Code. *See E.A.W. v. State*, 547 S.W.2d 63, 64 (Tex.Civ.App.—Waco 1977, no writ). In this case, no parent or friendly adult was present during appellant's interview at the children's shelter. All adults present, including the victim-services counselor, represented the interests of the State, not appellant.

Other states include the absence of a parent or guardian as a factor to consider in a totality of the circumstances analysis. *State v. John Doe*, 130 Idaho 811, 948 P.2d 166, 173 (App.1997). ("[T]he objective test for determining whether an adult was in custody for purposes of Miranda, giving attention to such factors as the time and place of the interrogation, police conduct, and the content and style

of the questioning, applies also to juvenile interrogations, but with additional elements that bear upon a child's perceptions and vulnerability, including the child's age, maturity and experience with law enforcement and the presence of a parent or other supportive adult."); *State v. J.Y.*, 623 So.2d 1232, 1234 (Fla.Dist.Ct.App.1993) (" '[U]nder the circumstances of this case, given the hour of night, given the nature of the questioning, the information the police had', '[t]he juvenile's age,' '[t]he lack of a parent being present,' and 'the type of questions being asked,' it is quite clear that 'anyone in [the juvenile's] position would not feel free to turn around and walk back in the house.' ").

17. There was no evidence presented that anyone was assigned to protect appellant's rights or represent her interests. The victim-services counselor testified at the hearing on the

ever, told that she was free to leave the interview room or the children's shelter, and she was never told she could call her grandparents or any other friendly adult. Appellant was isolated and alone during the police interrogation. This was despite the fact that the shelter, through the Department, had the duty to care for and protect appellant. During the course of the interview, the officers informed appellant that they had "talked to everyone in [her] family already, and ... cleared everybody," that "there's nobody left except [appellant]," and that they were "not going to go away." Based on the attendant circumstances outlined above, and taking into consideration the fact that appellant was confined to the shelter at the time of her interview with police, we find that a reasonable eleven-year-old who had never before been through the legal system would believe that her freedom of movement had been significantly restrained.[18] Accordingly, we hold that appellant was in custody at the time she made her statements.

 When we consider the totality of the circumstances surrounding appellant's interview, it is clear that appellant's statements, in whatever form, were obtained in violation of section 51.095 of the Family Code. At a minimum, we cannot say that appellant's statements were not the product of fright or despair. *See Gault,* 387 U.S. at 55, 87 S.Ct. 1428. Therefore, the juvenile court erred in refusing to suppress both appellant's recorded and written statements, which were rendered inadmissible in evidence under article 38.23 of the Code of Criminal Procedure as involuntary statements. We hold that the juvenile court's error in admitting these involuntary statements was not harmless. Therefore, we reverse the judgment of the juvenile court and remand this cause to that court for further proceedings not inconsistent with this opinion.[19]

---

motion to suppress that she attended the interview only to provide comfort to appellant if necessary.

18. At one point during the course of the interview, the officers left the room, leaving appellant alone with the victim-services counselor. At that time she told the counselor that she wanted to leave the shelter and that she had to ask permission to go anywhere, further evidence that appellant believed she was not free to leave the children's shelter.

19. Because our determination that the juvenile court erred in denying appellant's motion to suppress is dispositive, it is unnecessary to address appellant's remaining issues on appeal.